**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MICHAEL KONOWICZ, a/k/a
MICHAEL PHILLIPS, and ISARITHM, LLC,

Plaintiffs,

v.

JONATHAN P. CARR, SEVERE NJ
WEATHER, LLC, and WEATHER NJ, LLC,

Defendants.

Civil Action No. 15-6913 (MAS) (TJB)

**MEMORANDUM OPINION
FILED UNDER SEAL**

**SHIPP, District Judge**

This matter comes before the Court upon Defendants Jonathan P. Carr ("Carr"), Severe Weather, LLC ("Severe Weather"), and Weather NJ, LLC's ("Weather NJ") (collectively, "Defendants") Motion for Summary Judgment. (ECF No. 75.) Plaintiffs Michael Konowicz a/k/a Michael Phillips ("Konowicz") and Isarithm, LLC (collectively, "Plaintiffs") opposed (ECF No. 90), and Defendants replied (ECF No. 82). The Court has carefully considered the parties' arguments and decides the motion without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motion for Summary Judgment is granted.

## I.    PROCEDURAL BACKGROUND

Plaintiffs initiated this suit on August 16, 2015, asserting three causes of action against Defendants: (1) Defamation, (2) violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and (3) New Jersey Common Law Unfair Competition. (Compl. ¶¶ 31-54, ECF No. 1.) On November 15, 2015, Defendants answered and Carr counterclaimed with a single count of defamation against

Konowicz. (*See generally* Answer & Countercl., ECF No. 9.) On June 30, 2016, the Court granted Defendants' Motion for Judgment on the Pleadings (ECF No. 12) and denied Plaintiffs' Cross-Motion to Amend (Order, ECF No. 16).    On October 6, 2016, the Honorable Tonianne Bongiovanni, U.S.M.J., granted Plaintiffs' Motion to Amend the Complaint. (ECF No. 24.)

On October 10, 2016, Plaintiffs filed an Amended Complaint asserting the same three causes of action. (Am. Compl., ECF No. 28.) On November 7, 2016, Defendants filed an Answer to the Amended Complaint, and Carr asserted the same single count of defamation against Konowicz. (*See generally* Answer & Countercl., ECF No. 30.) The parties conducted discovery, and Judge Bongiovanni resolved discovery disputes between the parties. (*See e.g.*, ECF No. 40.)

On May 11, 2018, Defendants filed a Motion for Summary Judgment (Mot. for Summ. J., ECF No. 52), and Plaintiffs filed a Cross-Motion for Summary Judgment (Mot. for Summ. J., ECF No. 55).  On October 12, 2018, the Court terminated both parties' respective motions because of the parties' mutual failure to comply with Local Civil Rule 56.1 and Plaintiffs' failure to comply with Local Civil Rule 5.3.  (Mem. Op., ECF No. 72.)

On October 22, 2018, pursuant to the Court's October 12, 2018 Order, the parties re-filed their motions. (*See* Mots. For Summ. J., ECF Nos. 75, 78.) Defendants' motion addressed the procedural and substantive deficiencies identified in the Court's October 12, 2018 Memorandum Opinion.[1]  Specifically, Defendants' Statement of Undisputed Material Facts submitted in conjunction with the current motion was filed as a separate document, apart from the brief. (*See* Defs.' Statement of Undisputed Material Facts ("SUMF"), ECF No. 76-5.)  Significantly, it

---

[1] Plaintiffs' motion papers, however, again failed to comply Local Civil Rule 5.3.  Due to Plaintiffs' repeated failure to comply with the Local Civil Rules (*See* ECF Nos. 88, 96, 97), the Court considers Plaintiffs' motion separately.

provides a more extensive recounting of the material facts than the statement of facts Defendants submitted along with their original motion.

On October 29, 2018, Plaintiffs filed opposition papers that contained redactions, and Plaintiffs did not file an unredacted version of the papers for the Court's review in accordance with Local Civil Rule 5.3. (*See* ECF Nos. 79, 81.) On December 12, 2018, the Court ordered Plaintiffs to file unredacted versions of Plaintiffs' opposition papers within five days, or Defendants' motion would be considered unopposed. (Order, ECF No. 88.) On December 17, 2018, Plaintiffs filed unredacted opposition papers. (*See* ECF Nos. 89, 90.)

Plaintiffs' Opposition Brief, however, is the same brief Plaintiffs filed in response to the version of Defendants' motion the Court previously terminated. As a result, Plaintiffs' brief contains a three-paragraph "Responsive Statement of Material Facts" that purports to respond to the "Statement of Undisputed Material Facts" contained in Defendants' brief. (Pls.' Opp'n Br. 6, ECF No. 90.) Defendants' brief, however, does not contain a "Statement of Undisputed Facts" as Defendants corrected that issue when they refiled their motion. (*See* Defs.' Moving Br. 5, 22, ECF No. 76-1; L.Civ.R. 56.1.) These three paragraphs purport to admit and deny facts that are no longer alleged in Defendants' brief. Moreover, they are entirely unresponsive to the new and significantly different statement of facts submitted as a separate document in support of Defendants' motion. The Court, accordingly, disregards Plaintiffs' Responsive Statement of Material Facts.

Plaintiffs' Opposition Brief contains a three-paragraph Supplemental Statement of Disputed Material Facts. (Pls.' Opp'n Br. 6-7.) These paragraphs violate Local Civil Rule 56.1 as they are arguments and conclusions of law. L.Civ.R. 56.1 ("Each statement of material fact . . . shall not contain legal argument or conclusions of law."). The Court, accordingly, disregards Plaintiffs' Supplemental Statement of Disputed Material Facts.

Plaintiffs' opposition papers include a Counterstatement of Disputed Facts in which Plaintiffs, in accordance with Local Civil Rule 56.1, admitted, denied, or denied as material each paragraph of Defendants' SUMF. (*See* Pls.' Counterstatement of Undisputed Material Facts ("CDF"), ECF No. 90-7.) The Court considers Plaintiffs' CDF.

## II.    **FACTUAL BACKGROUND**[2]

The instant matter arises from a series of statements made by Carr regarding Plaintiffs. (*See* Am. Compl. ¶¶ 22-37.) Carr is a weather enthusiast who operates Weather NJ[3] through a website, www.weathernj.com, and social media platforms including: Facebook, Twitter, Instagram, and YouTube. (SUMF ¶ 1.) Carr began forecasting weather in or about February 2010 under the name Severe NJ Weather. (*Id.* ¶ 2.) Presently, Carr has 225,000 followers.[4] (*Id.* ¶ 7.) Carr avers that his "weather reporting activities remain 'just a hobby[,]'" and that he earns on average $1,100 per month, and never more than $17,000 in a year, from his weather related activities. (*Id* ¶ 13.) Plaintiffs deny that Carr's "weather-related activities constitute a hobby." (CDF ¶ 13.)

Konowicz is a "professional, accredited meteorologist" who uses the professional name "Michael Phillips." (Am. Compl. ¶ 9.) Konowicz operates a website, www.weatherboy.com, and has a presence on several social media platforms. (*Id.* ¶ 11.) Konowicz previously owned the registered trademark for *Weatherboy*® until he assigned the trademark to Isarithm. (*Id.* ¶ 12.)

---

[2] The Court's factual summary draws primarily from Defendants' SUMF. As necessary, the Court notes where Plaintiffs' CDF disputes a fact.

[3] Weather NJ was formerly known as Severe NJ Weather. (SUMF ¶ 1.)

[4] Carr avers that he has 225,000 followers but does not indicate how these followers are distributed across his social medial platforms and his website. (*Id.* ¶ 7 (citing Decl. of Jonathan Carr ¶ 7, ECF No. 76-2).)

Konowicz obtained a Certificate in Broadcast Meteorology from Mississippi State University ("MSU") and is a "full Member" of the American Meteorological Society ("AMS"). (*Id.* ¶ 10.)

On December 8, 2014, Carr, using the Twitter username "@myWeatherNJ," posted the following statement on Twitter: "Real name Michael Konowicz. No degree or AMA record. fake audience."[5] (SUMF ¶ 55.) The comment was part of a thread initiated by a third party. (SUMF ¶¶ 50-55; Defs.' Moving Br., Ex. 22) Plaintiffs admit that the statements in the thread were made. (CDF ¶¶ 50-55.) Plaintiffs, however, dispute the substantive truth of the statements. (*See* CDF ¶¶ 50-55.)

Carr asserts that there were four bases for the December 2014 Statement. (SUMF ¶ 56.) First, that he knew "that the Weatherboy's real name was Michael Konowicz because two of [Konowicz's] Facebook followers had sent [Carr] his real identity." (*Id.* ¶ 57.) Second, that "based on Google searches, [Carr] could find no record of . . . Konowicz having a meteorology degree[,]" and that Konowicz's "Linked-In profile . . . makes no mention of any relevant degrees in meteorology." (*Id.* ¶ 58.) Third, Carr "checked for . . . Konowicz on listings kept by the AMS," and Konowicz was not among listings for either of the AMS's accreditation programs. (*Id.* ¶ 59.) Fourth, that for nearly a year, Carr had seen online posts "presenting what he believed at the time (and still believes to this day) to be overwhelming evidence that . . . Konowicz was purchasing 'fake' likes in order to fraudulently boost the social media presence of Weatherboy Weather." (*Id.* ¶ 60.)

Plaintiffs admit Carr's first basis for the December 2014 Statement. (CDF ¶ 57.) Plaintiffs admit an unknown part of Carr's second basis for the statement and state that Carr could have

---

[5] The Court refers to this statement as the "December 2014 Statement." Additionally, while Carr wrote "AMA," the parties interpret the statement to refer to the AMS. (*See e.g.* CDF ¶ 55.)

inquired with MSU regarding whether Konowicz had attained the same certificate Mike Masco[6] holds. (*See* CDF ¶ 58.) Plaintiffs deny Carr's third basis and insist that "Konowicz is a member of AMS." (*Id* ¶ 59.) Plaintiffs deny Carr's fourth basis for the December 2014 Statement and "maintain[] that alleged evidence of false social media engagement was created by [David] Tolleris and Masco."[7] (*Id.* ¶ 60.)

On February 21, 2015, Carr, as "@WeatherNJ," posted the following statements on Twitter: "careful of Weatherboy Weather. Total fraud. Have unsettling proof"; and "records on Michael Konowicz. Not a pro met. Not a member of AMS."[8] (SUMF ¶¶ 64-75.) The comments were part of a thread initiated on Weatherboy's Twitter feed. (SUMF ¶ 64; Defs.' Moving Br., Ex. 22; Pls.' Opp'n Br. Ex. E.) Plaintiffs admit that the statements in the thread were made. (CDF ¶¶ 64-65.) Plaintiffs dispute the substantive truth of the statements. (CDF ¶¶ 64-75.)

Carr relied on five bases for the February 2015 Statements. (SUMF ¶ 66.) The first four bases are the same bases that he relied on when making the December 2014 Statement. (*Compare* SUMF ¶¶ 56-60, *with* SUMF ¶¶ 66-70.) Carr's fifth basis is that he "continued to monitor the Weatherboy's engagement anomalies, fraudulent 'likes' from Turkey and other foreign nations, and lack of transparency regarding the identity of his 'team members,'" and this served to "'strengthen [Carr's belief]' that the Weatherboy was engaging in fraudulent practices in order to misrepresent himself to the public and boost his social media profile." (*Id.* ¶ 71.)

Plaintiffs repeat the same admissions, denials, and arguments regarding Carr's first four bases for the February 2015 Statements as Plaintiffs proffered for the December 2014 Statement.

---

[6] Mike Masco is a meteorologist for an ABC affiliate in Baltimore, Maryland. (SUMF ¶ 38.)

[7] David Tolleris is a meteorologist. (*Id.* ¶ 46.)

[8] The Court refers to these statements as the "February 2015 Statements."

(*Compare* CDF ¶¶ 56-60, *with* CDF ¶¶ 66-70.)  Plaintiffs deny Carr's fifth basis, asserting that "Plaintiffs' engagement was primarily from the United States[,]" and that Plaintiffs "worked with a team of meteorologists at the time." (CDF ¶ 71.)  Plaintiffs also deny "purchasing 'likes'[.]" (*Id.* ¶ 71.)

On March 2, 2015, Carr, responding to a Twitter post by @Weatherboy, posted the following comments: "Chicago story fake.  No names.  No credentials.  No supporting media.  Shots similar to other images on Google images"; "Keep sponsoring fake articles to fake audience while impersonating a fake team of meteorologists. #stayclassy"; "541 likes on a sponsored article to a fan-base of 250k.  Sorry, that proves dirty pool.  For real unparalleled trust and reach see . . . my page"; and "just some guy impersonating a team of meteorologists practicing horrible journalism."[9] (*See* SUMF ¶¶ 76-88; Am. Compl. Ex. 4, ECF No. 28-1.)  The comments were part of a thread initiated by Konowicz, on his own Twitter page, in which he stated that he had been invited by United Airline's global headquarters in Chicago to "better understand their winter weather ops." (*Id.* ¶ 76.)  Plaintiffs admit the March 2015 Statements were made, but dispute their truth. (CDF ¶¶ 76-78.)

Carr states that he relied upon six bases in making these statements. (SUMF ¶ 79.)  Five of the six bases are the same bases for his previous statement. (*Compare* SUMF ¶¶ 66-70, *with* SUMF ¶¶ 80-86.)  Carr's sixth basis was that he "used Google Images to search for the images that the Weatherboy used in his posting.  That search revealed very similar images, which led

---

[9] The Court refers to these statements as the "March 2015 Statements." Defendants' SUMF does not explicitly identify all the statements Carr made on March 2, 2015, as shown in Exhibit 4 to the Amended Complaint. (*Compare* SUMF ¶¶ 76-88 *with* Am. Compl. Ex. 4, ECF No. 28-1.) Defendants, nevertheless, cite to the Amended Complaint and Exhibit 4 in the SUMF. (SUMF ¶¶ 76-78.) The Court, accordingly, does not view Defendants' failure to cite all of the statements as a material fact in dispute.

[Carr] to believe that the Weatherboy had simply copied the images from public sources on the Internet." (SUMF ¶ 85.)

Plaintiffs repeat the same admissions, denials, and arguments regarding the first five bases for the March 2015 Statements as Plaintiffs proffered for the February 2015 Statements. (*Compare* CDF ¶¶ 66-70, *with* CDF ¶¶ 80-84.) In regard to Carr's sixth basis, Plaintiffs "[admit] that [Carr] searched" and "[deny] as to any conclusion [Carr] drew from 'very similar images.'" (CDF ¶ 85.) Plaintiffs state that Konowicz "was invited to Chicago and provided a letter confirming his visit afterward." (*Id.* ¶ 85.)

On June 23, 2015, one of Carr's online followers sent Carr a photo of what the sender thought was a tornado. (SUMF ¶ 91.) Carr posted the same photo on Facebook. (*Id.* ¶ 91.) Konowicz took the photo and posted it on his own webpage with a red line through it, and included a warning that the National Weather Service ("NWS") was still investigating whether what was depicted in the photo was a tornado. (*Id.* ¶ 92.) In the same post, Konowicz stated that the NWS had "taken a stand against [Carr]" and had been "very vocal in calling [Carr] out for spreading harmful misinformation." (*Id.* ¶ 93.) The parties dispute whether Carr was "reprimanded" or "called out." (*Compare* SUMF ¶ 91, *with* CDF ¶ 91.)

Carr contacted Gary Szatkowski at the NWS to confirm whether the NWS had reprimanded him, and Szatkowski responded. (SUMF ¶¶ 96-97.) In separate tweets, Szatkowski stated:

> Sorry, but the sun is out. Worst of storm has moved on. Why would that be a tornado?
>
> \* \* \*
>
> Well, I just think it's misrepresented as a tornado. But others can have different opinions.
>
> \* \* \*
>
> To be confirmed tornado, a damage survey must be done. It must have a start and end point. Maximum wind speed is evaluated.

> \* \* \*
>
> For that ever to be more than a pretty picture of an interesting cloud, that is what must happen.
>
> \* \* \*
>
> If its not important that it be confirmed as a tornado, [then] call it what you wish. I simply won't be able to concur.

(*Id.*)

On June 25, 2015, Carr published an article entitled "Beware of the fake 'Team of Meteorologists'" (the "June 2015 Article") on Weather NJ's website. (SUMF ¶ 98, Ex. 5.) Defendants aver that this article repeated statements Carr previously made on Twitter, "including: (1) Weatherboy's fraudulent, purchased 'likes' and followers on his social media accounts; (2) his history of low engagement rates despite a large audience because he purchases 'likes' and 'followers'; (3) his lack of transparency regarding the identities and credentials of himself and his 'team members'; and, (4) his history of attacks on [Defendant] and other members of the online weather community." (SUMF ¶ 99.)

Carr asserts that he had seven bases for the June 2015 Article. (SUMF ¶ 100.) Six of the seven bases are the same bases for the March 2015 Statements. (*Compare* SUMF ¶¶ 80-86, *with* SUMF ¶¶ 101-106.) Carr's seventh basis was Konowicz's statement regarding the online dispute over the alleged reprimand by the NWS, Szatkowski's confirmation that the NWS had not reprimanded Carr, and that Szatkowski was "not aware of any problems" with Carr. (SUMF ¶ 107.)

Plaintiffs repeat the same admissions, denials, and arguments regarding the first six bases for the March 2015 Statements as proffered for the June 2015 Article. (*Compare* CDF ¶¶ 80-86, *with* CDF ¶¶ 101-106.) Regarding the seventh basis, Plaintiffs assert that "Weatherboy's post was false as the NWS had called Carr out for making his post and Defendants' post was misleading." (*Id.* ¶ 107.)

On July 8, 2015, Plaintiffs' Counsel sent Defendants a cease-and-desist letter.  (Decl. of Jonathan Carr ("Carr Decl."), Ex. 32, ECF 76-3.)  In that correspondence, Plaintiffs' Counsel stated that Konowicz is "a full 'Member' of AMS, a designation which is reserved for those that demonstrate 'professional or scholarly expertise in the atmospheric or related sciences, technologies, applications, or services.'"  (*Id.*)  After the instant lawsuit was filed, Defendants' Counsel applied to become a member of the AMS, and received an AMS Membership Certificate similar to Konowicz's AMS Membership Certificate.  (SUMF ¶ 142.  *Compare* Carr Decl., Ex. 34, *with* Carr Decl. Ex. 35.)  On February 8, 2016, Plaintiffs' Counsel sent Defendants' Counsel a cease-and-desist letter.  (Decl. of David P. Heim, Ex. L, ECF No. 90-8.)

### III.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate if the record demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A material fact—a fact "that might affect the outcome of the suit under governing law," *Anderson*, 477 U.S. at 248— raises a "genuine" dispute if "a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).  To determine whether a genuine dispute of material fact exists, the Court must consider all facts and reasonable inferences in a light most favorable to the non-movant.  *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).  The Court will not "weigh the evidence and determine the truth of the matter" but will determine whether a genuine dispute necessitates a trial.  *Anderson*, 477 U.S. at 249.

The party moving for summary judgment has the initial burden of proving an absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  Thereafter,

the nonmoving party creates a "genuine [dispute] of material fact if it has provided sufficient evidence to allow a jury to find [for him] at trial." *Becton Dickinson & Co. v. Wolckenhauer*, 215 F.3d 340, 343 (3d Cir. 2000)

### A.    Defamation

A defamation claim has three elements: "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher." *G.D. v. Kenny*, 15 A.3d 300, 310 (N.J. 2011) (quoting *DeAngelis v. Hill*, 847 A.2d 1261, 1267 (N.J. 2004)). In cases where the plaintiff is a public figure, the plaintiff also must establish that the defendant made the statements at issue with "actual malice." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). "Actual malice has 'nothing to do with hostility or ill will;' rather it concerns [a] publisher's 'state of knowledge of the falsity of what he published, not at all upon his motivation in publishing it.'" *DeAngelis*, 847 A.2d at 1270 (N.J. 2004) (quoting *Lawrence v. Bauer Pub. & Printing Ltd.*, 446 A.2d 469, 477 (N.J. 1982)).

"[C]ourts have recognized that the perpetuation of meritless actions, with their attendant costs, chills the exercise of free speech about public affairs." *Berkery v. Estate of Stuart*, 988 A.2d 1201, 1209 (N.J. Super. Ct. App. Div. 2010). Accordingly, "trial courts should not hesitate to use summary judgment procedures where appropriate to bring such actions to a speedy end." *Id.* "On the other hand, the actual-malice standard entails a subjective analysis of the defendant's state of mind[,]" and "the issue of a defendant's state of mind in a defamation action 'does not readily lend itself to summary disposition.'" *Id.* (quoting *Maressa v. N.J. Monthly*, 445 A.2d 376, 386 n.10 (N.J. 1982)). "Courts should carefully examine the circumstances surrounding publication of

defamatory allegations of fact to determine whether the issue of actual malice should go to the jury." *Id.*

### B.    The Lanham Act

Section 43(a) of the Lanham Act provides, in pertinent part:

> Any person who, on or in connection with any . . . services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

> The Lanham Act does not define "advertising" or "promotion." However, courts have held that commercial advertising or promotion consists of four elements: (1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) for the purpose of influencing customers to buy the defendant's goods or services; and (4) disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within the industry.

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 456 (D.N.J. 2009).

"Every circuit that has addressed the issue has found that the Lanham Act restricts only commercial speech, as commercial speech is entitled to reduced protection under the First Amendment." *Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29, 40 (D.D.C. 2012) (collecting cases), *aff'd sub nom.*, *Farah v. Esquire Magazine*, 736 F.3d 528 (D.C. Cir. 2013). The Third Circuit Court of Appeals has not explicitly held that the Lanham Act only applies to commercial speech. Nevertheless, the District Court for the Eastern District of Pennsylvania recently dismissed Lanham Act claims because the statements at issue were not commercial speech. *See Golo, LLC v. Highya, LLC*, 310 F. Supp. 3d 400, 507 (E.D. Pa. 2018) ("[The] [d]efendants' reviews

of [the] [p]laintiff's product do not qualify as commercial speech, with the result that [the] [p]laintiff's Lanham Act claims and state law unfair competition claim must be dismissed.").

## C.    New Jersey Common Law Unfair Competition

Under New Jersey common law, relief is granted for the tort of unfair competition upon the following grounds:

> [E]ither that the means are dishonest, or that, by imitation of name or device, there is a tendency to create confusion in the trade, and enable the seller to pass off upon the unwary his goods as those of another, and thereby deceive the purchaser; or that, by false representation, it is intended to mislead the public, and induce them to accept a spurious article in the place of one they have been accustomed to use.

*Squeezit Corp. v. Plastic Dispensers*, 106 A.2d 322, 325 (N.J. Super. Ct. App. Div. 1954) (citation omitted).

"There is no distinct cause of action for unfair competition. It is a general rubric which subsumes various other causes of action." *C.R. Bard, Inc. v. Wordtronics Corp.*, 561 A.2d 694, 696 (N.J. Super. Ct. App. Div. 1989). This is because it is intended to encompass generally unfair play in the commercial arena: "the concept is deemed as flexible and elastic as the evolving standards of commercial morality demand." *Ryan v. Carmona Bolen Home for Funerals*, 775 A.2d 92, 95 (N.J. Super. Ct. App. Div. 2001) (internal quotation marks and citation omitted). "The judicial goal should be to discourage, or prohibit the use of misleading or deceptive practices which renders competition unfair." *Id.* "Generally, . . . unfair competition claims under New Jersey statutory and common law mirror unfair competition claims under . . . the Lanham Act." *Cozzens v. DaveJoe RE, LLC*, No. 17-11535, 2019 WL 522071, at *4 (D.N.J. Feb. 11, 2019) (quotations omitted).

## IV.    **DISCUSSION**

Defendants advance two principal legal arguments in support of their Motion for Summary Judgment: (1) that Plaintiffs have failed to establish actual malice in publishing the allegedly defamatory statements; and (2) that summary judgment on Plaintiffs' Lanham Act claim should be granted in Defendants' favor because the statements at issue in the matter were not commercial in nature. (Defs.' Moving Br. 5, 22.) The central proposition of Defendants' motion, as related to Plaintiffs' defamation claim, is that at the time Carr made the statements, Carr believed in the truth of his statements and his belief was supported by objective facts which he observed. (*See id.* at 11, 15, 18, 20 (discussing Carr's investigations and beliefs at the time he made the statements).) Regarding Plaintiffs' Lanham Act claim, Defendants argue that Carr's statements are not "commercial advertising or promotion" under 15 U.S.C. § 1125(a)(1)(B). (*Id.* at 22.) Defendants advance no specific arguments regarding Plaintiffs' Unfair Competition claim. (*See generally id.*)

Plaintiffs oppose Defendants' motion arguing that Carr published the statements at issue "knowing that they were false or with a reckless disregard for their truth or falsity" and that Carr's "statements fit squarely within the parameters of commercial speech as identified by the Supreme Court." (Pls.' Opp'n Br. 5.) Plaintiffs also argue that, at the least, there are genuine disputes of material fact and summary judgment must be denied. (*Id.* at 5.)

After a careful review of the record, including exhibits containing numerous hard-to-read printouts of social media posts, the Court concludes that there are no genuine disputes of material fact and Defendants are entitled to summary judgment on all claims. Furthermore, the Court finds that Carr's statements are not commercial speech or advertising, thus the statements are not actionable under the Lanham Act.

## A.    Konowicz is a Public Figure

The threshold inquiry is whether Konowicz is a public figure. *Schwartz v. Worrall Publ'ns, Inc.*, 610 A.2d 425, 428 (N.J. Super. Ct. App. Div. 1992) ("[T]he judge should decide at the threshold whether a defamation plaintiff is a public official or figure since the existence of the *New York Times* privilege is itself dependent on the status of the person defamed."). The Supreme Court has identified two types of public figures: (1) general public figures and (2) public figures for a limited purpose. A general-purpose public figure is defined as someone "who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures . . . ." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). "Some [people] occupy positions of such persuasive power and influence that they are deemed public figures for all purposes." *Id.* at 345. Others, however, are only public figures by virtue of the limited controversy in which they find themselves. *Id.*

The New Jersey Supreme Court interpreted the Supreme Court's holding regarding limited purpose public figures as follows:

> *Gertz* refrains from establishing specific criteria against which a plaintiff's status can be measured to determine whether or not he is a public figure. Rather in instances where the plaintiff is not a public figure for all purposes, *Gertz* calls for a case-by-case examination "looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." Important factors that led the Court to conclude that the *Gertz* plaintiff was not a public figure included [the] plaintiff's lack of any calculated relationship with the press and the fact that he neither "thrust himself into the vortex of this public issue, nor [engaged] the public's attention in an attempt to influence its outcome."

*Lawrence v. Bauer Pub. & Printing Ltd.*, 446 A.2d 469, 475 (N.J. 1982) (quoting *Gertz*, 418 U.S. at 352) (internal citations omitted); *accord MacKay v. CSK Pub. Co.*, 693 A.2d 546, 554 (N.J. Sup. Ct. App. Div. 1997).

Here, the parties appear to agree that Konowicz is a public figure. Plaintiffs submitted evidence regarding Konowicz's prominent place in the meteorological community, beginning when Konowicz appeared on the David Letterman show in high school. (Pls.' Opp'n Br., Ex. L-A ("Monroe teenager is TV's Weatherboy".) Additionally, Plaintiffs submitted many articles written by and about Konowicz in relation to meteorology. (*See* Pl.'s Reply Br., Exs. A, L-B, L-C.) Plaintiffs' Twitter account, username "Weatherboy," has at least 20,000 followers, and at one time had many more. (Defs.' Moving Br., Ex. 43.) According to Plaintiffs, Konowicz's page has received over 270,000 "likes, and @Weatherboy on Twitter has over 104,000 followers. Finally, after Defendants advanced arguments based on the conclusion that Konowicz is a public figure, Plaintiffs did not dispute this conclusion and advanced arguments assuming Konowicz is a public figure. (Pls.' Opp'n Br. 8-23; Defs.' Moving Br. 5-22.) The Court, accordingly, finds that Konowicz is a public figure.

**B.    Plaintiffs Have Not Raised a Genuine Dispute of Material Fact Regarding Actual Malice**

In *New York Times v. Sullivan*, the Supreme Court held that in instances where the plaintiff is a "public figure," the plaintiff must establish that the defendant made the statements at issue with "actual malice." 376 U.S. 254, 279-80 (1964). In *Saint Amant v. Thompson*, the Supreme Court analyzed the actual malice standard and held that a defendant who made statements about his opponent's character in a political race was not liable for defamation, despite the defendant's failure to investigate and lack of consideration of the consequences for the plaintiff. 390 U.S. 727, 732-33 (1968). Actual malice requires evidence that the defendant entertained serious doubts about the veracity of his statements. *Id.* at 731. The actual malice standard does not ask whether a reasonably prudent person would have published the statements in similar circumstances. *Id.* "Rather, the focus of the 'actual malice' inquiry is on a defendant's attitude toward the truth or

falsity of the publication, on his subjective awareness of its probable falsity, and his actual doubts as to its accuracy." *Costello v. Ocean Cty. Observer*, 643 A.2d 1012, 1024 (N.J. 1994). New Jersey imposes a heightened standard in that the plaintiff must prove actual malice by clear and convincing evidence. *Id.* at 1022.

The Supreme Court clarified the actual malice standard in *Garrison v. Louisiana*, holding that reckless disregard in the context of actual malice requires the statements be made with a "high degree of awareness of their probable falsity . . . ." 379 U.S. 64, 74 (1964). Public officials, moreover, are "permitted to recover in libel only when they could prove that the publication involved was deliberately falsified, or published recklessly despite the publisher's awareness of probable falsity." *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 153 (1967).

A "bald assertion by the publisher that he believes in the truth of the statement may not be sufficient[,]" to protect the publisher from liability for publication of the statement. *Dairy Stores, Inc. v. Sentinel Pub. Co.*, 516 A.2d 220, 232–33 (N.J. 1986) (citing *St. Amant*, 390 U.S. at 732). "Notwithstanding a publisher's denial that it had serious doubts about the truthfulness of the statement, other facts might support an inference that the publisher harbored such doubts." *Id.* at 233.

> The finder of fact must determine whether the publication was made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*St. Amant*, 390 U.S. at 732. "Sufficient evidence [for a finding in the plaintiff's favor] does not exist . . . when the only evidence offered is that the defendants 'should have known the articles

were false, or they at least should have doubted their accuracy.'" *Costello*, 643 A.2d at 1023

(quoting *Lawrence v. Bauer Pub. & Printing Ltd.*, 446 A.2d 469, 477 (N.J. 1982)).

> [T]ruth is a defense to a defamation action even if a report on a matter of public concern contains minor inaccuracies. But a statement that is not substantially accurate, a statement whose "substance," "gist," and "sting" cannot be justified will not be protected under the shield of truth. [The plaintiff] bears the burden of proving that the defamatory statements were not substantially accurate and therefore false.

*Kenny*, 15 A.3d at 316-17 (citations omitted).

### 1.     The December 2014 Statement

Here, despite Plaintiffs' denials of Carr's bases for the December 2014 Statement, Plaintiffs have not demonstrated that there is a material fact in dispute requiring a jury to determine whether the December 2014 Statement was made with actual malice. Specifically, none of Plaintiffs' denials of facts show that Carr entertained serious doubts about the falsehood of the December 2014 Statement at the time the statement was made. For example, Plaintiffs aver that Carr could have contacted MSU to inquire whether Konowicz held a certificate from MSU. (CDF ¶ 58.) This, however, could not establish that when Carr made the December 2014 Statement, Carr knew that Konowicz held the certificate from MSU or that Carr entertained any doubts regarding the truth of the statement.

Both parties dedicate a significant portion of their briefs and Rule 56.1 statements to debating whether Konowicz is a member of the AMS. In Defendants' view, Konowicz's membership as a "full member" is materially distinguishable from two accreditation programs AMS provides. (*See* Defs.' Moving Br. 16-18.) Defendants state that AMS accredits (1) Certified Broadcast Meteorologists and (2) Certified Consulting Meteorologists, and that Konowicz does not have either accreditation. (SUMF ¶¶ 137-140.) Defendants insist that the only "membership" Konowicz holds from AMS is the same membership Defendants' counsel secured from AMS. (*Id.*

¶ 142.) Plaintiffs insist that Defendants have admitted that Konowicz is a member of AMS, and that is sufficient to show that Carr's statement was false. (*See* CDF ¶ 141; Pls.' Opp'n Br. 18-20.)

Plaintiffs' proffered facts and arguments regarding his AMS membership are unavailing. The relevant issue is whether Plaintiffs can show that Carr publicized the statement that Konowicz was not a member of AMS with actual malice or reckless disregard for the truth. On this issue, Plaintiffs have failed to proffer any evidence to raise a genuine dispute regarding whether at the time Carr made the December 2014 Statement he entertained any doubts as to the accuracy of the statement or that he was aware of the potential falsity of the statement. Rather, Carr's online investigation supports Defendants' position regarding Carr's belief in the truth of the statement. Plaintiffs have not pointed the Court to any evidence to contradict these facts. Thus, while Konowicz may be a member of AMS per his operative definition of a "full member" and in direct contradiction to Carr's operative definition of membership, that fact does not raise a genuine dispute over whether Carr made the statement with knowledge of its falsity or with reckless disregard.

Plaintiffs assert that Carr's fourth basis for the December 2014 Statement—prior social media posts by third parties—is false. (CDF ¶ 60.) Assuming, *arguendo*, Plaintiffs are correct, and these third-party social media posts were substantively false, Plaintiffs have cited no facts suggesting that Carr would have known, or should have known, about the falsity of these posts prior to making the December 2014 Statement. Plaintiffs merely deny the veracity of Defendants' proffered facts, not whether Carr himself questioned the veracity of the posts. (CDF ¶ 60.)

In sum, Defendants have proffered facts about the bases for Carr's belief that the December 2014 Statement was true at the time he made the statement. (SUMF ¶ 56-63.) In response, Plaintiffs either admitted or denied those bases and proffered facts regarding the truth of the

information Carr states were the bases of his beliefs. (*See* CDF ¶¶ 56-63.) Plaintiffs, however, have offered no facts suggesting that Carr entertained any doubt regarding the truth of his statements. Plaintiffs, accordingly, have not raised a genuine dispute of material fact.

Plaintiffs repeat their approach of attacking the truth of the facts that Defendants advance in support of their motion for summary judgment for each of the remaining statements. While the Court analyzes each statement on its own, Plaintiffs' fail to bring to the Court's attention sufficient, if any, evidence to raise a genuine dispute of material fact regarding Carr's attitude toward the falsity of his statements, his subjective awareness of the probable falsity of his statement, or whether Carr had actual doubts regarding the accuracy of his statements. Moreover, because the Court concludes that Plaintiffs failed to meet their burden to raise a genuine dispute of material fact, the Court does not analyze whether the substantive truth of the statements would serve as a defense.

2.    **The February 2015 Statements**

Despite Plaintiffs' denials of Defendants' bases for the February 2015 Statements, Plaintiffs have failed to reference evidence of record sufficient to raise a material dispute of fact regarding the February 2014 Statement. Specifically, Plaintiffs' denial of Defendants' fifth basis for the February 2015 Statement is based on the substantive truth of (1) whether Plaintiffs' social media and online engagement was from the United States, or other countries, (2) whether Plaintiffs purchased "likes", (3) and the identity of Plaintiffs' team members. (CDF ¶ 71.) This denial does not address Carr's attitude toward the truth or falsity of the statements nor does it address Carr's subjective awareness of the probable falsity, and his actual doubts about the accuracy of the statements. The fact that Carr "monitored . . . [Plaintiffs'] engagement anomalies," and made certain conclusions regarding his observations suggests that Carr did not entertain a serious doubt

about the truth of the February 2015 Statement. (SUMF ¶ 71.) Plaintiffs do not dispute that Carr monitored Plaintiffs' engagement or that he drew certain conclusions. (*See* CDF ¶ 71.) As a result, Plaintiffs cannot meet their burden of establishing that there is a material fact in dispute.

### 3.    The March 2015 Statements

Plaintiffs have not met their burden of showing that there is a material fact in dispute regarding the March 2015 Statements. The parties disagree about the substantive truth of the March 2015 Statements, specifically whether Konowicz was invited by United Airlines to see its weather-related operations and whether Konowicz attended the same. Plaintiffs admit that Carr conducted a Google search and located images similar to those he viewed regarding Konowicz's social media. (CDF ¶ 85.) While Plaintiffs deny that Carr came to certain conclusions regarding the similarity between the images, Plaintiffs do not point the Court to any evidence supporting that denial. (*See id.*) Plaintiffs bear the burden of demonstrating that there is a material fact in dispute, and cannot do so merely by denying the truth of Carr's March 2015 Statements and what conclusions Carr drew from his internet searching for similar images.

### 4.    The June 2015 Article

As with the previous statements, Defendants have advanced facts that establish the bases for Carr's belief that the statements he made in the June 2015 Article were true at the time he made them. (SUMF ¶¶ 100-110.) In response, Plaintiffs either admitted those bases, or denied the bases and offered facts that speak to the underlying veracity of the statements. (CDF ¶¶ 100-110.) Despite Plaintiffs' denials of Defendants' bases for the statements made within the June 2015 Article, Plaintiffs have failed to offer any evidence that Carr made these statements while knowing they were false or with reckless disregard of their probable falsity. Moreover, assuming that the statements by Gary Szatkowski were "reprimands" does little to help Plaintiffs meet their burden.

Carr's statement disputing whether he was reprimanded by the NWS is not in and of itself defamatory of Plaintiffs. Plaintiffs, accordingly, have failed to meet their burden.

### 5.    Failure to Retract and Substantive Truth

The thrust of Plaintiffs' arguments is that the combination of (1) the fact that Carr's statements were factually inaccurate at the time they were made and (2) Carr's failure to retract the statements when he was provided information and evidence that purportedly established the falsity of the statements shows that Carr made the statements with actual malice. These arguments, however, are unpersuasive because the parties disagree about the objective truth of certain facts. The Court briefly reviews each of these disagreements to explain why Plaintiffs have not met their burden of establishing that a material fact is in dispute and why there is no issue that should be put to a jury.

New Jersey precedent on the impact of a retraction, or the failure to publish a retraction, on the actual malice analysis is sparse. In a matter in which the publisher issued a retraction, the Appellate Division noted that a delay in publication of the retraction "says little, if anything, about the [publisher's] state of mind at the time of publication." *Schwartz v. Worrall Publ'ns, Inc.*, 610 A.2d 425, 431 (N.J. Super. Ct. App. Div. 1992). The Appellate Division also noted that:

> [T]he failure to promptly retract may be relevant in evaluating a media defendant's motives. However, like evidential factors concerning journalistic care (or lack thereof), motive evidence is relevant only circumstantially, and courts must be careful not to place too much reliance on such factors.

*Id.* (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989)).

Plaintiffs' arguments regarding retraction are inextricably intertwined with Plaintiffs' arguments regarding the substantive truth about the following issues: (1) whether Konowicz is a meteorologist, (2) whether Konowicz is a member of AMS, (3) whether Konowicz had a team of

meteorologists, and (4) whether Konowicz's posting regarding visiting United Airline's hub was false. The parties' disagreements on these issues support the conclusion that Plaintiffs cannot raise a material dispute of fact with respect to whether the statements were made with actual malice and, accordingly, there is no issue for a jury to decide.

Konowicz states that his peers consider him a meteorologist, he has a certification from MSU in meteorology, and he has over two decades of experience in broadcast meteorology. (Pls.' Opp'n Br. 14-15.) Plaintiffs also proffer Carr's testimony regarding Mike Masco, an individual who holds the same MSU certificate as Konowicz. (*Id.* 15-16 (citing Jonathan Carr Dep. Tr. ("Carr Dep.") 126-130, ECF No. 76-6).) Carr's deposition testimony shows that he was aware of this fact. (Carr Dep. 126:23-127:6.) It also reveals that in Carr's personal opinion "because [Masco] lacks the bachelor's degree, he's not a true meteorologist." (*Id.* 128:7-17.) Plaintiffs' Counsel asked Carr if he ever contacted Masco to "call him out" about not being a "meteorologist." (*Id.* 128:19-22.) Carr stated that he "saw no reason to." (*Id.* 128:23.)

Plaintiffs construe Carr's testimony to demonstrate that "[Carr] singled out [Konowicz], and purposely sought to discredit him." (Pls.' Opp'n Br. 16.) Carr's differential treatment of Masco and Konowicz provides evidence that Carr had ill will or hostility toward Konowicz. However, "[a]ctual malice has nothing to do with hostility or ill will . . . ." *DeAngelis*, 847 A.2d at 1270.

The parties' disagreement over the operative portion of the AMS's definition of a meteorologist reinforces the conclusion that Plaintiffs cannot show that Carr made the statements with actual malice. The AMS's guidelines provide, in pertinent part:

> A meteorologist is an individual with specialized education . . . .
> This specialized education is most typically in the form of a
> bachelor's degree or higher in, or with a major or specialization in,

meteorology or atmospheric science consistent with the AMS Statement or a Bachelor's Degree in Atmospheric Science.

There are cases where an individual has not obtained a degree in meteorology or atmospheric science but has gained sufficient knowledge through coursework and/or professional experience to successfully fill professional positions, such as military weather forecasters or positions held by degreed meteorologists. These individuals can also be referred to as meteorologists.

(*Compare* SUMF ¶ 117, *with* CDF ¶ 117 (agreeing on the language of the AMS's guidelines on the use of the term "meteorologist").) Plaintiffs aver that Konowicz is a meteorologist pursuant to the latter portion of the definition that allows an individual to be considered a meteorologist based on coursework and professional experience. (CDF ¶ 117.) Defendants focus on the former part of the definition that requires a bachelor's degree or higher degree. (Defs.' Moving Br. 13-15.) Plaintiffs assert that Defendants were provided with Konowicz's professional credentials and a copy of the AMS's definition of a meteorologist. (Pls.' Opp'n Br. 21.) According to Plaintiffs, Carr's failure to retract after receipt of these materials is evidence of Carr's actual malice. (*Id.*) Plaintiffs fail to acknowledge that the materials provided to Defendants also support Carr's reliance on the first portion of the AMS definition to determine that an individual who lacks a bachelor's degree and only has a certificate, like Konowicz, is not considered a meteorologist pursuant to the AMS guidelines. Thus, Plaintiffs' proffered evidence of actual malice also undermines Plaintiffs' claim of actual malice.

The parties' disagreement over whether Konowicz is a member of AMS also supports dismissal and undermines Plaintiffs' arguments. Plaintiffs aver that Konowicz is a member of AMS and that Defendants have admitted as such. (Pls.' Opp'n Br 20; CDF ¶ 141.) Defendants aver that Konowicz has the same membership that is open to any member of the public and the same membership as Defendants' counsel despite his counsel having zero experience in meteorology. (Defs.' Moving Br. 16-17; SUMF ¶ 141.) The record shows that Carr investigated

Konowicz's AMS "membership" by searching two directories for AMS's accreditation programs AMS makes available to the public and Carr did not locate Konowicz in those directories. (SUMF ¶¶ 59, 69) Plaintiffs insist that they provided Defendants with evidence of Konowicz's AMS membership through the cease and desist letters as well as through the complaint in this matter and Defendants' failure to print a retraction is evidence of Carr's actual malice. (Pls.' Opp'n Br. 21 (quoting Carr Dep. 63:15-22).)

Plaintiffs' evidence regarding Konowicz's membership in AMS, his providing of the same information to Defendants, and Defendants' failure to retract provides little support to Plaintiffs' assertion that Carr made the statements with actual malice. Plaintiffs' evidence shows that they provided some objective evidence to Carr that Konowicz holds at least one type of the several types of membership or accreditation AMS offers. Plaintiffs' proffer, however, fails because the evidence does not reflect that Carr knew of Konowicz's membership at the time the statements were made, nor does it undercut the results of Carr's contemporaneous investigation into the AMS directories.

Plaintiffs' evidence regarding Konowicz's "team" of meteorologists also provides scant support for actual malice. Konowicz proffers evidence that he employed two independent meteorologists, Aeris (a company that directly employs meteorologists), a photographer, and a designer. (*See* Pls.' Opp'n Br. 21-23.) Accepting all of this as true and that this group of individuals constitutes a "team", the evidence of these employment relationships only came out during discovery in this matter. Plaintiffs provide no evidence that Carr would have known of this evidence at the time he made the statements. Because the evidence regarding Konowicz's "team" of meteorologists was disclosed in the midst of the instant litigation, the evidence does little to show what Carr's mental state was at the time he made the statements. That Carr has failed to

retract the statements in the midst of litigation does little to help Plaintiffs to meet their burden of establishing that there is a material fact in dispute regarding actual malice.

Plaintiffs argue that four photographs attached to the February 6, 2016 cease-and-desist letter and Carr's failure to retract certain statements in light of those photos is further evidence of Carr's actual malice. (Pls.' Opp'n Br. 23-24.) Specifically, Plaintiffs argue that the photos rebut the February 2015 Statements because they show that Konowicz actually visited United Airlines in Chicago. (*Id.*) Defendants argue that prior to making the February 2015 Statement, Carr searched and found similar images on Google and that the photos Plaintiffs have provided "are merely evidence that [Konowicz] was at some airport at some time for some purpose." (Defs.' Moving Br. 19-20.) Plaintiffs argue that Defendants admit that Carr could have updated the February 2015 Statements after receiving the photos. (Pls.' Opp'n Br. 23.) The fact that Carr could have adjusted his posts after receiving countervailing evidence months after the fact is significantly undercut by Carr's testimony that he continued to entertain doubts about what Plaintiffs' proffered images purported to show. (*See* Carr Dep 43:7-9 (stating "If I had to go back and supplement my tweet I would say, oh look, another photograph with no direct proof.").)

In sum, when the statements at issue are analyzed individually and in the larger context of whether the statements were factually accurate, Plaintiffs have not raised a genuine dispute of material fact sufficient regarding whether Carr made the statements at issue with actual malice. In Plaintiffs' view, large portions of the statements were factually false and this, and other factors, establish that the statements were made with actual malice. The record evidence reflects that Carr made the statements believing that they were true at the time. Defendants have proffered evidence showing that Carr continues to believe the statements. Plaintiffs have not pointed the Court to any evidence rebutting those assertions. Plaintiffs' theories that Defendants' ill will, failure to inquire

with Plaintiffs regarding the truth of the posts, and failure to retract after the fact are undercut by the fact that Carr investigated prior to making certain statements and continues to believe in the truth of certain statements.  For these reasons, the Court concludes that Plaintiffs have failed to demonstrate a genuine dispute of material fact regarding whether the statements at issue were made with actual malice.

### C.    Carr's Statements are not Commercial Speech

When deciding whether speech is commercial, "the Third Circuit requires courts to assess whether the speech (i) is an advertisement, (ii) refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech." *Golo, LLC*, 310 F. Supp. 3d at 504 (citing *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1017 (3d Cir. 2008)).  "An affirmative answer to all three questions provides 'strong support' for the conclusion that the speech is commercial." *Facenda*, 542 F.3d at 1017 (quoting *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 933 (3d Cir. 1990)).  "Stated succinctly, the commercial speech doctrine rests heavily on 'the common sense distinction between speech proposing a commercial transaction . . . and other varieties of speech.'" *U.S. Healthcare, Inc.*, 898 F.2d at 933 (quoting *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 637 (1985)).

In discussing the Lanham Act, the parties cite *Edward Lewis Tobinick, MD v. Novella* (*Tobinick*), a case from the Eleventh Circuit Court of Appeals.  848 F.3d 935 (11th Cir. 2017), *cert. denied sub nom.*, *Tobinick v. Novella*, 138 S. Ct. 449 (2017).  In *Tobinick*, both parties were doctors, one of whom invented a novel treatment procedure and administered said procedure to patients.  *Id.* at 936.  The defendant published an article detailing:  (1) how he learned of the plaintiff's treatment procedures, (2) "the typical characteristics of 'quack clinics' or 'dubious health clinics,' [(3)] the key features of [the plaintiff's] clinic, and [(4)] lastly, the plausibility of

and the evidence supporting [the plaintiff's] allegedly effective use of" a certain drug. *Id.* at 940. The defendant also quoted a Los Angeles Times article which reported that the plaintiff's "claims about the back treatment led to an investigation by the California Medical Board, which placed him on probation for unprofessional conduct and made him take classes in prescribing practices and ethics." *Id.* After the plaintiff filed a complaint against the defendant in the District Court for the Southern District of Florida, the defendant published another article detailing the lawsuit and argued that the suit was "designed to silence his public criticism of [plaintiff's] practices." *Id.* at 941. The defendant was the executive editor of, and contributor to, a blog operated by a non-profit entity. *Id.* at 940.

The Eleventh Circuit found that the defendant's statements were not actionable under the Lanham Act. Specifically, the Court of Appeals concluded that there was "no genuine dispute of material fact regarding whether [the defendant's] articles are commercial speech[,]" because a "plain reading of the first and second articles makes clear that they do not fall within the core notion of commercial speech as they do not propose a commercial transaction." *Id.* at 950. Moreover, the "articles evoke many characteristics of noncommercial speech[,]" as they "communicate[ ] information, express[ ]opinion, [and] recite[ ] grievances." *Id.* (quoting *N.Y. Times Co.*, 376 U.S. at 266).

In the instant matter, Defendants argue that the Court should grant summary judgment in their favor because the Eleventh Circuit's analysis in *Tobinick* applies. (Defs.' Moving Br. 25.) Specifically, Defendants argue that a "plain reading" of Carr's statement makes clear that the statements were not commercial speech. (*Id.*) Defendants also assert that "Carr is not in the weather business; it is just his hobby." (*Id.* at 22.)

Plaintiffs oppose the grant of summary judgment arguing that *Tobinick* is materially distinguishable from the instant matter. (Pls.' Opp'n Br. 24.) First, Plaintiffs argue that Carr's statements are "merely personal attacks on Plaintiff[s,]" and "not entitled to the same level of protection, as the statements in *Tobinick*." (*Id.* at 25.) Plaintiffs further argue that the parties in *Tobinick* were not competitors, while, here, "[Konowicz] is [Carr's] largest competitor in New Jersey." (*Id.*) Plaintiffs insist that in the March 2015 Statements, Defendants solicited Plaintiffs' followers, and in the June 2015 Article, Carr promoted himself. (*Id.*) Plaintiffs refute Defendants' "just a hobby" argument by arguing that Carr has an economic motivation for attempting to discredit Plaintiffs and increase Carr's own online profile. (*Id.* at 26.)

The Court agrees with Defendants that a plain reading of the statements makes clear that the statements are not commercial speech. Neither the December 2014 Statement nor the February 2015 Statements refer to a specific product or service nor do they propose a commercial transaction. As Plaintiffs concede, these statements are closer to personal attacks on Plaintiffs. (Pls.' Opp'n Br. 25.) Moreover, these statements communicated information—the Weatherboy's real name—and expressed opinion—that Konowicz had a "fake audience," was a "total fraud," and not a member of AMS. *See N.Y. Times Co.*, 376 U.S. at 266. These statements, accordingly, are not commercial speech. *Id.*; *Tobinick*, 848 F.3d at 950.

The content of the March 2015 Statements and the June 2015 Article require a more fulsome analysis. The March 2015 Statements are not an advertisement in the traditional sense. Nevertheless, Carr's statement, "For real unparalleled trust and reach see . . . my page," is the sort of comparative language that is usually found in commercial advertisements. Moreover, by referring to his own webpage, Carr specifically referenced the service he provides—weather forecasts through his webpage and social media outlets. The June 2015 Article was posted on

Defendants' website and contains negative descriptions of Plaintiffs followed by a positive description of Carr and Defendants' website. Arguably, these statements satisfy the three factors the Supreme Court set out in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66-67 (1983), which are: (1) if the speech at issue was "conceded to be advertisements", (2) the statement included a "reference to a specific product", (3) and if the speaker had an "economic motivation" for making the statement. *Id.* If all of these factors are satisfied, there is "strong support for [a] District Court's conclusion that the [speech is] properly characterized as commercial speech." *Id.* at 67.

Here, as in *Tobinick*, the Court finds that Plaintiffs' implied theory regarding Defendants' economic motivation is too attenuated to establish economic motivation in the commercial speech context. Plaintiffs have not identified any evidence in the record to establish Carr's economic motivation. The record, nevertheless, does reflect that Defendants generated revenue from Defendants' website. (Carr Dep. 117:9-122:17.) To the extent Plaintiffs' theory is that Defendants derive revenue from driving viewers to Defendants' website, this theory is insufficient. As the *Tobinick* Court stated, "the placement of . . . articles next to revenue-generating advertising [is] [in]sufficient in this case to show a liability-causing economic motivation . . . ." *Tobinick*, 848 F.3d at 952.

> Both advertising and subscriptions are typical features of newspapers, whether online or in-print. But, the Supreme Court has explained that "if a newspaper's profit motive were determinative, all aspects of its operations—from the selection of news stories to the choice of editorial position—would be subject to regulation if it could be established that they were conducted with a view toward increased sales. Such a basis for regulation clearly would be incompatible with the First Amendment."

*Id.* (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973)). The Court, accordingly, concludes that the March 2015 Statements and June 2015 Article were not commercial speech, and, as a result, they are not actionable under the Lanham Act.

The Court further finds that based on its findings related to Plaintiffs' Lanham Act Claim, Defendants are entitled to Summary Judgment on Plaintiffs' Unfair Competition Claim. *See Buying for The Home, LLC v. Humble Abode, LLC*, 459 F. Supp. 2d 310, 317 (D.N.J. 2006) ("Because the elements of a claim of unfair competition under the Lanham Act are the same as for claims of unfair competition and trademark infringement under New Jersey statutory and common law, the [c]ourt's analysis . . . extends to [p]laintiff's state law claims as well."); *see also Bracco Diagnostics, Inc.*, 627 F. Supp. 2d at 454 (stating "unfair competition claims under New Jersey statutory and common law generally parallel those under § 43(a) of the Lanham Act.").

## V.    CONCLUSION

For the reasons set forth above, the Court finds that Plaintiffs have failed to raise a genuine dispute of material fact regarding whether Carr made the December 2014 Statement, the February 2015 Statements, the March 2015 Statements, and published the June 2015 Article with actual malice. The Court also finds that these statements are not commercial speech, and, as a result, the statements are not actionable under the Lanham Act and do not support a New Jersey common law unfair competition claim. Defendants, accordingly, are entitled to summary judgment and the Court grants Defendants' motion. An order consistent with this Memorandum Opinion will be entered.

s/Michael A. Shipp

**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

**DATED:** May 31st , 2019